UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| TOSHIF PATEL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REATA PHARMACEUTICALS, INC., J. WARREN HUFF, and MANMEET S. SONI,<br><br>Defendants. | Case No. 20-CV-796<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Toshif Patel ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Reata Pharmaceuticals, Inc. ("Reata" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Reata securities between

1

October 15, 2019 and August 7, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Reata was founded in 2002 and is headquartered in Plano, Texas. The Company was formerly known as Reata Discovery, Inc., and changed its name to Reata Pharmaceuticals, Inc. in May 2005. Reata is a clinical stage biopharmaceutical company that develops novel therapeutics for patients with serious or life-threatening diseases by targeting molecular pathways that regulate cellular metabolism and inflammation.

3. Among Reata's drug candidates under development is omaveloxolone, which is in Phase 2 clinical development to treat Friedreich's ataxia ("FA"). Following the announcement of positive data from the MOXIe Part 2 study of omaveloxolone for FA in October 2019, the Company represented that it would seek submission for marketing approval of omaveloxolone for the treatment of FA in the U.S. with the U.S. Food and Drug Administration ("FDA").

4. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the MOXIe Part 2 study results were insufficient to support a single study marketing approval of omaveloxolone for the treatment of FA in the U.S. without additional evidence; (ii) as a result, it was foreseeable that the FDA would not accept marketing approval of omaveloxolone for the treatment of FA in the U.S. based on the MOXIe Part 2 study results; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5. On August 10, 2020, during pre-market hours, Reata issued a press release announcing its second quarter 2020 financial results, wherein it disclosed that the FDA "is not convinced that the MOXIe Part 2 results" of the Company's study assessing omaveloxolone for the treatment of FA "will support a single study approval without additional evidence that lends persuasiveness to the results," and that, "[i]n preliminary comments for [a] meeting, the FDA stated that [Defendants] will need to conduct a second pivotal trial that confirms the mFARS [modified Friedreich's Ataxia Rating Scale] results of the MOXIe Part 2 study with a similar magnitude of effect."

6. On this news, Reata's stock price fell $51.79 per share, or 33.16%, to close at $104.41 per share on August 10, 2020.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Reata is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

11. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

PARTIES

12. Plaintiff, as set forth in the attached Certification, acquired Reata securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Defendant Reata is a Delaware corporation with principal executive offices located at 5320 Legacy Drive, Plano, Texas 75024.  Reata's securities trade in an efficient market on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "RETA."

14. Defendant J. Warren Huff ("Huff") has served as Reata's Chief Executive Officer at all relevant times.

15. Defendant Manmeet S. Soni ("Soni") has served as Reata's Chief Financial Officer and Executive Vice President at all relevant times.  Soni has also served as Reata's Chief Operating Officer since June 2020.

16. Defendants Huff and Soni are sometimes referred to herein as the "Individual Defendants."

17. The Individual Defendants possessed the power and authority to control the contents of Reata's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Reata's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Reata, and their

access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

18. Reata and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19. Reata was founded in 2002 and is headquartered in Plano, Texas. The Company was formerly known as Reata Discovery, Inc., and changed its name to Reata Pharmaceuticals, Inc. in May 2005. Reata is a clinical stage biopharmaceutical company that develops novel therapeutics for patients with serious or life-threatening diseases by targeting molecular pathways that regulate cellular metabolism and inflammation.

20. Among Reata's drug candidates under development is omaveloxolone, which is in Phase 2 clinical development to treat FA. Following the announcement of positive data from the MOXIe Part 2 study of omaveloxolone for FA in October 2019, the Company represented that it would seek submission for marketing approval of omaveloxolone for the treatment of FA in the U.S. with the FDA.

### Materially False and Misleading Statements Issued During the Class Period

21. The Class Period begins on October 15, 2019. On October 14, 2019, during after-market hours, Reata issued a press release announcing positive topline results from the MOXIe Part 2 study of omaveloxolone for FA, and stating that the Company would seek marketing

approval for omaveloxolone for treating FA in the U.S. based on those results (the "October 2019 Press Release"). Specifically, that press release stated, in relevant part, that "the registrational Part 2 portion of the MOXIe Phase 2 trial of omaveloxolone in patients with [FA] met its primary endpoint of change in the [mFARS] relative to placebo after 48 weeks of treatment"; that "[p]atients treated with omaveloxolone (150 mg/day) demonstrated a statistically significant, placebo-corrected 2.40 point improvement in mFARS after 48 weeks of treatment (p=0.014)"; that "[o]maveloxolone treatment was generally reported to be well-tolerated"; and that "[b]ased on these positive results, and subject to discussions with regulatory authorities, the company plans to proceed with the submission of regulatory filings for marketing approval in the [U.S.] and internationally."

22. Additionally, the October 2019 Press Release quoted Defendant Huff, who represented, in relevant part, that "[t]he MOXIe trial with omaveloxolone is the first study to demonstrate a significant improvement in neurological function in patients with FA," and that Defendants "believe that the MOXIe findings announced today bring [them] closer to [their] goal of providing an urgently needed therapy to patients with FA."

23. The October 2019 Press Release also quoted Ronald Bartek, President of the Friedreich's Ataxia Research Alliance ("FARA"), who represented, in relevant part, that "[t]he results of MOXIe represent a truly historic moment for the patients, families, and caregivers that comprise the [FA] community"; that, "[b]ased on the results reported today for omaveloxolone, [Defendants and FARA] are hopeful that [their] community will finally have its first approved therapy that can slow this relentlessly progressive disease"; and that Defendants and FARA "look forward to continuing the Reata-FARA partnership as [they] work in pursuit of approval of the first FA therapy."

24. On February 19, 2020, Reata filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K contained substantively the same statements as referenced in ¶ 21, *supra*, regarding seeking marketing approval for omaveloxolone for FA in the U.S. based on the MOXIe Phase 2 trial results.

25. With respect to Reata's rationale for pursuing marketing approval of omaveloxolone for FA in the U.S. based on the MOXIe Phase 2 trial results, the 2019 10-K stated, *inter alia*, that "[p]art 2 of MOXIe is the largest global, interventional trial ever conducted in FA"; that "[t]he primary endpoint for the trial was the change in the mFARS score for omaveloxolone relative to placebo after 48 weeks of treatment"; that "[t]he FDA has indicated that mFARS is an acceptable primary endpoint to evaluate the effect of omaveloxolone for the treatment of patients with FA"; that the FDA "may consider either accelerated or full approval based on the overall results of the trial and strength of the data"; that "[o]maveloxolone treatment demonstrated statistically significant evidence of efficacy for the primary endpoint of the trial, producing a placebo-corrected 2.40 point mean improvement (decrease) in mFARS (n=82; p=0.014)"; that "[o]maveloxolone treatment also demonstrated statistically significant evidence of efficacy in mFARS at Week 48 when the *pes cavus* patients were included in the analysis (the all randomized population)"; that "[i]n the all randomized population, omaveloxolone treatment produced a statistically significant, placebo-corrected 1.93 point mean improvement (decrease) in mFARS (n=103; p=0.034)"; and that "[o]maveloxolone treatment also improved several secondary endpoints included in the trial."

26. Additionally, the 2019 10-K represented, in relevant part, that "omaveloxolone ha[s] been extensively studied by many investigators"; that "tissue-protective and therapeutic

effects have been observed in many preclinical models and are associated with meaningful improvements in hallmarks of disease progression, such as inflammation, tissue remodeling, and fibrosis"; and that Reata's "Nrf2 activators [including omaveloxolone] are the subject of over 400 peer-reviewed publications and have been studied in over 50 preclinical animal models in which they have demonstrated anti-inflammatory, tissue-protective, or anti-fibrotic effects in" various parts of the body, including "the kidney, heart, brain, liver, lungs, vasculature, fat tissue, pancreas, bone marrow, intestines, eyes, spinal cord, prostate, inner ear, and skin"; all of which further indicated to investors that Defendants had adequate information to determine that marketing approval for omaveloxolone for FA in the U.S. could be supported by the MOXIe Phase 2 trial results.

27. With respect to Reata's preparations for marketing approval of omaveloxolone, the 2019 10-K represented, in relevant part, that Defendants are "in the process of preparing for a potential commercial launch of omaveloxolone in FA in the [U.S.]"; that Reata's "ability to launch omaveloxolone is dependent on the successful filing and defense of an NDA [new drug application] and approval by the FDA"; that Defendants "are on track for planned NDA and commercial launch drug supplies"; that Defendants "have hired commercial leadership and are building the teams, infrastructure, systems, and processes necessary for the launch of omaveloxolone in the [U.S.]"; that Defendants "are expanding quality and compliance functions to support commercialization"; that Defendants' "manufacturing and quality teams are in place for the current stage of program development with plans to grow as needed to support commercial supply and distribution of omaveloxolone"; that Defendants "have completed registration batches for drug substance and drug product"; that "[a] three-year, room temperature, shelf life has been established for clinical-image omaveloxolone capsules at the target commercial dose"; and that

Defendants "believe that the synthesis from regulatory starting material to drug substance can be manufactured at scale, resulting in a commercially competitive cost of goods."

28. Additionally, the 2019 10-K contained generic, boilerplate representations regarding potential risks associated with seeking marketing approval for omaveloxolone. For example, the 2019 10-K stated, *inter alia*, that "there can be no assurance that further clinical trials [for omaveloxolone] will not be required, or that regulatory delays will not be incurred"; that "[i]t could be years before the trials required for their approval are completed, if ever"; that Defendants "may need to complete additional or larger and more extensive controlled clinical trials to validate the results observed in clinical trials to date to continue further development and seek regulatory approval of" omaveloxolone; that Defendants "have announced positive results from the . . . MOXIe trial of omaveloxolone in patients with FA and are in discussions with the FDA regarding these results," but "there can be no assurance that [Defendants] will submit an NDA for either of these indications, or, if an NDA is submitted, that it will be accepted by the FDA, or, if accepted, that the NDA will be approved by the FDA"; that "the submission of an NDA, MAA [Marketing Authorisation Application], or other marketing application is a complicated process"; that Defendants "have limited experience in preparing, submitting, and prosecuting regulatory filings, and have not previously submitted an NDA, MAA, or other marketing application"; that, "[c]onsequently, [Defendants] may be unable to successfully and efficiently execute and complete necessary clinical trials and other requirements in a way that leads to the submission of an NDA, MAA, or other marketing application and approval of any product candidate [they] are developing"; that Defendants "may require more time and incur greater costs than [their] competitors and may not succeed in obtaining regulatory approvals of product candidates that [they] develop"; and that "[r]isks related to the . . . successful filing of the NDA exist not only

9

because of the complexity of the process, but also because of [Defendants'] lack of previous experience as an organization." Plainly, the foregoing risk warnings were generic, catch-all provisions that were not tailored to Reata's actual known risks regarding the MOXIe Part 2 study results, much less their sufficiency to support marketing approval of omaveloxolone for the treatment of FA in the U.S.

29. Appended as exhibits to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that "[t]he [2019 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and result of operations of the Company."

30. Also on February 19, 2020, Defendants hosted an earnings call with investors and analysts to discuss Reata's fourth quarter and full year 2019 financial and operating results. On that call, Defendant Huff assured investors that Defendants had "buil[t] an experienced commercial leadership team capable of launching . . . omaveloxolone globally."

31. The statements referenced in ¶¶ 21-30 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the MOXIe Part 2 study results were insufficient to support a single study marketing approval of omaveloxolone for the treatment of FA in the U.S. without additional evidence; (ii) as a result, it was foreseeably likely that the FDA would not accept marketing approval of omaveloxolone for the treatment of FA in the U.S. based on the MOXIe Part 2 study results; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

32.  On August 10, 2020, during pre-market hours, Reata issued a press release announcing its second quarter 2020 financial results, wherein it disclosed that the FDA "is not convinced that the MOXIe Part 2 results" of the Company's study assessing omaveloxolone for the treatment of FA "will support a single study approval without additional evidence that lends persuasiveness to the results," and that, "[i]n preliminary comments for [a] meeting, the FDA stated that [Defendants] will need to conduct a second pivotal trial that confirms the mFARS results of the MOXIe Part 2 study with a similar magnitude of effect." Specifically, that press release stated, in relevant part:

> Following the announcement of the positive data from the MOXIe Part 2 study in October 2019, we have planned, subject to discussion with regulatory authorities, to proceed with a submission for marketing approval of omaveloxolone for the treatment of [FA] in the [U.S.] We recently completed a Type C meeting in which the FDA provided us with guidance that it does not have any concerns with the reliability of the mFARS primary endpoint results in the MOXIe Part 2 study. Nevertheless, the FDA is not convinced that the MOXIe Part 2 results will support a single study approval without additional evidence that lends persuasiveness to the results. In preliminary comments for the meeting, the FDA stated that we will need to conduct a second pivotal trial that confirms the mFARS results of the MOXIe Part 2 study with a similar magnitude of effect.
>
> In response to the preliminary comments, [FARA], key FA clinicians, and we provided the FDA with information to demonstrate that it will be difficult to conduct an additional, prospective clinical trial in FA because of the very slow progression rate of FA, the limited number of FA patients available for clinical research, the small number of clinical trial investigators who can conduct the mFARS exam, and the impact of the COVID-19 pandemic on the ability to conduct neuroscience clinical trials. Thus, conducting an additional pivotal study would result in a long delay in the availability of a potentially effective therapy to patients with a progressive, life-threatening disease with no treatment options. The FDA acknowledged the unmet need of patients with FA, reiterated its commitment to facilitate the development of omaveloxolone within the constraints of the regulatory standards, and emphasized its willingness to consider all available options to meet the regulatory standards. The FDA also acknowledged that launching a new, neuroscience clinical trial now may not be possible because of the COVID-19 pandemic.

33. On this news, Reata's stock price fell $51.79 per share, or 33.16%, to close at $104.41 per share on August 10, 2020.

34. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Reata securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Reata securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Reata or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Reata;

- whether the Individual Defendants caused Reata to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Reata securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Reata securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Reata securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

42. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

44. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

45. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Reata securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Reata securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

47. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Reata securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Reata's finances and business prospects.

48. By virtue of their positions at Reata, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Reata, the Individual Defendants had knowledge of the details of Reata's internal affairs.

50.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Reata.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Reata's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Reata securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Reata's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Reata securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

51. During the Class Period, Reata securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Reata securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Reata securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Reata securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

52. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

54. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55. During the Class Period, the Individual Defendants participated in the operation and management of Reata, and conducted and participated, directly and indirectly, in the conduct of Reata's business affairs.  Because of their senior positions, they knew the adverse non-public information about Reata's misstatement of income and expenses and false financial statements.

56. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Reata's financial condition and results of operations, and to correct promptly any public statements issued by Reata which had become materially false or misleading.

57. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Reata disseminated in the marketplace during the Class Period concerning Reata's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Reata to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Reata within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Reata securities.

58. Each of the Individual Defendants, therefore, acted as a controlling person of Reata. By reason of their senior management positions and/or being directors of Reata, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Reata to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Reata and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Reata.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

    A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

    B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

    C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

    D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 15, 2020

                      Respectfully submitted,

                      */s/ Willie Briscoe*
                      WILLIE C. BRISCOE
                      State Bar Number 24001788
                      THE BRISCOE LAW FIRM, PLLC
                      12700 Park Central Drive, Suite 520
                      Dallas, TX 75251
                      Telephone: 972-521-6868
                      Facsimile: 281-254-7789
                      wbriscoe@thebriscoelawfirm.co

                      POMERANTZ LLP
                      Jeremy A. Lieberman
                      (*pro hac vice* application forthcoming)
                      J. Alexander Hood II
                      (*pro hac vice* application forthcoming)

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*